**Michael NORMAN, Relator,**

v.

**CAMPBELL-LOGAN BINDERY, INC.,
Department of Economic Security,
Respondents.**

**No. C3–85–1047.**

Court of Appeals of Minnesota.

Nov. 12, 1985.

James V. Roth, Minneapolis, for relator.

John M. Giblin, Minnetonka, for Campbell-Logan Bindery, Inc.

Hubert H. Humphrey, III, Atty. Gen., James Patrick Barone, Sp. Asst. Atty. Gen., St. Paul, for Dept. of Economic Sec.

Heard, considered, and decided by POPOVICH, C.J., and LESLIE and NIERENGARTEN, JJ.

## OPINION

LESLIE, Judge.

Michael Norman appeals from a determination by the Commissioner of Economic Security that his actions constituted misconduct which disqualified him from receiving unemployment compensation benefits. We reverse.

## FACTS

Relator, Michael Norman, worked for the respondent Campbell-Logan Bindery, Inc. as a book binder from April 1983 to February 7, 1985. Shortly after he began working for Campbell-Logan, Norman began to teach a course on book binding on the employer's premises. Norman's employer, Gregor Campbell, encouraged him to teach the class, and provided him with some of the course materials.

In January 1985, the class was moved to the Minnesota Center for Book Arts ("MCBA"). Campbell, who was on the Board of Directors of the MCBA, agreed to continue his support of the class by providing materials. However, Campbell told Norman to keep a record, for inventory and

tax purposes, of the materials which were taken from the bindery premises.

The exact substance of the parties' communications regarding the course materials is disputed. Campbell testified that he specifically told Norman to obtain permission before taking any materials. He also testified that he told Norman to keep a list of those materials. Norman, on the other hand, testified that Campbell told him "[i]f you need any materials, take it, keep a record of it so that I can give it to my accountant * * * ".

On February 3, 1985, Campbell conducted an inventory of the MCBA to see if any Campbell-Logan materials were there. The inventory produced approximately $120 worth of supplies which Norman had taken from the bindery. Although some of the supplies were rolled up in paper or tucked away underneath benches, some of them were also lying around in plain view.

Campbell testified that at that point he decided to fire Norman, but he first wanted to separate their tools. Instead of immediately discharging Norman, Campbell asked him to take his personal tools home. Four days later, Campbell discharged Norman. Although the discharge was precipitated by an unrelated event, it is undisputed that the actual reason for Norman's discharge concerned the removal of the supplies from the bindery to MCBA.

## ISSUE

1. Was Norman discharged for misconduct which disqualified him from the receipt of unemployment compensation benefits?

## ANALYSIS

The Commissioner's representative determined that relator was disqualified from receiving unemployment compensation benefits pursuant to Minn.Stat. § 268.09, subd. 1(2)(1984), because he had been discharged for misconduct. "Misconduct" is defined as follows:

[C]onduct evincing such wilful or wanton disregard of an employer's interests as is found in deliberate violations or disregard of standards of behavior which the employer has the right to expect of his employee, or in carelessness or negligence of such degree or recurrence as to manifest equal culpability, wrongful intent or evil design or, to show an intentional and substantial disregard of the employer's interests or of the employee's duties and obligations to his employer. On the other hand mere inefficiency, unsatisfactory conduct, failure in good performance as the result of inability or incapacity, inadvertencies or ordinary negligence in isolated instances, or good faith errors in judgment or discretion are not to be deemed "misconduct" * * *.

*Tilseth v. Midwest Lumber Co.*, 295 Minn. 372, 374, 375, 204 N.W.2d 644, 646 (1973) (quoting *Boynton Cab Co. v. Neubeck*, 237 Wis. 249, 259, 296 N.W. 636, 640 (1941)). An employer has the burden of proving that an employee was discharged for misconduct. *Lumpkin v. North Central Airlines, Inc.*, 296 Minn. 456, 459, 209 N.W.2d 397, 400 (1973).

The scope of review of this court is limited. As stated in *White v. Metropolitan Medical Center*, 332 N.W.2d 25 (Minn. 1983):

The narrow standard of review requires that findings be viewed in the light most favorable to the decision, and if there is evidence reasonably tending to sustain them, they will not be disturbed.

*Id.* at 26. The Commissioner's determinations regarding credibility should be upheld if there is evidence reasonably tending to sustain them. *Cary v. Custom Coach, Inc.*, 349 N.W.2d 331, 332 (Minn.Ct.App. 1984).

Despite this limited scope of review, we are persuaded that in this instance the employer has failed to meet its burden of proving that relator was discharged for misconduct. A thorough review of the record reveals that Norman's actions were at most the result of a misunderstanding regarding Campbell's wishes. Norman testified:

[C]lasses started at MCBA on Tuesday, January 15th and at ten to five that evening I was working back and as Mr. Campbell was leaving he turned to me and we had final remarks about that being the first night of classes. And he said to me, if you need any materials take it, keep a record of it so that I can give it to my accountant so that it can be deducted along with the other tax deductible items from my taxation. And that's in fact what I did. I hadn't given him the list and in fact on that meeting on the 4th of February, I apologized for having not given him the list but it was only the second week of class and because it was a new class and a new facility everything had to settle down, so I wasn't ready to give him a list. And in fact all of the materials that were in dispute were returned to Mr. Campbell by me and none of it had been used.

Campbell did not specifically deny that the conversation of January 15th had taken place, although his perception of the discussion differed from Norman's:

There is a meeting that he keeps talking about on January 15th I believe where I allegedly told him to take stuff. *I do not remember that conversation.* We, in setting up Minnesota Center for Book Arts we were trying to get this thing going as fast as we could. It needed a lot of amenities. As much as I could donate I was donating. *I do not remember him running over there or trying to get classes starting and saying, take it, I don't know about that conversation. I'm not denying it but I'm not saying that it ever happened.* Michael was specifically told again by me in no uncertain terms materials that were going must be approved by me before they left, that I had to see them, that I had to know what it was. We don't have unlimited supplies of anything. And there's absolutely no doubt in my mind that conversation took place and Michael understood at that time. * * * Michael said * * * [t]he only thing that he intended to take was a box [of] cuts, meaning scraps of cloth. That he showed me, I said that's fine, take

that, or take it. That may be what he's referring to in his conversation, *I do not know what specifically happened on January 15th.* (Emphasis supplied.)

When this testimony is analyzed in combination with the other evidence offered by the parties, it is apparent that Norman took the materials from his employer's premises under the mistaken impression that he could submit a list at a later date. This conduct does not rise to the level of willful or wanton disregard—or even extreme negligence or carelessness—which is required for a finding of misconduct. At most, Norman's actions constituted ordinary negligence or a good faith error in judgment.

Our conviction that Norman did not intend to disobey his employer's directives is buttressed by testimony that even though Norman knew the inventory was going to take place he left many of the materials in plain view. We find it unbelievable that Norman would have moved the materials to MCBA in violation of direct orders, knowing that Campbell was on the board of MCBA, was an active supporter of its projects and had a key to its premises. Norman's reaction when confronted with the "evidence" seized during the inventory was consistent with our belief that he did not intend to violate Campbell's orders. Norman testified:

I went on to say that I was sorry that I hadn't given him the list. I reminded him of the conversation that took place at ten to five on the 15th and said that I'd have to be pretty stupid to steal, leaving the materials in a place where he had access, unrestricted access to and knowing full well that he was a director.

Campbell's testimony on this point was similar to Norman's:

He did acknowledge that [the materials] were there [and] said he would not, he didn't steal them, that there was a list, that he would not put his job in jeopardy for a few scraps of paper, something to that effect.

Here the evidence does not support an inference of theft or even a substantial

disregard of an employer's interests. Even when we view the evidence in the light most favorable to the commissioner's findings, we find that the evidence simply does not support those findings.

### DECISION

Relator was involuntarily separated from his employment for reasons other than misconduct, and is not disqualified from receiving unemployment compensation benefits.

Reversed.